CLEARED FOR PUBLIC FILING

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SHARIFULLAH**, *et al,* | ) |
| *Petitioners/Plaintiffs,* | ) |
| | ) |
| v. | ) **Civil Action No.  08-CV-1222 (EGS)** |
| | ) |
| | ) |
| **GEORGE W. BUSH,** *et al* | ) |
| *Respondents/Defendants.* | ) |
| | ) |

**PETITIONER'S RESPONSE TO GOVERNMENT'S BRIEF REGARDING
PRELIMINARY AND PROCEDURAL FRAMEWORK ISSUES**

Petitioner Sharifullah, by his undersigned counsel, submits this Brief on Preliminary and Procedural Issues in response to the Order of this Court dated July 31, 2008, and the government's brief filed on August 12, 2008. (Dkt. # 101).

## Statement Of Unclassified Facts

Petitioner Sharifullah is, upon information and belief, approximately 27 years of age. Petitioner was initially captured in Jalalabad, Afghanistan while in a military compound under the control of General Said Agha and Haji Qadir, Govenor of Nangahar.  Upon information and belief, petitioner has never fought with al Qaeda or the Taliban or any military forces against the United States or coalition forces.  Nevertheless, Petitioner was ultimately taken into custody by the United States government and transferred to Guantánamo Bay, Cuba, where he is been imprisoned, virtually *incommunicado,* since approximately March 2003.[1]

## ARGUMENT

## I. INTRODUCTION

In *Boumediene* v. *Bush*, 128 S. Ct. 2229, 2275 (2008), the Supreme Court declared that "the costs of delay can no longer be borne by [Guantanamo detainees] who are held in custody. The detainees in these cases are entitled to a prompt habeas corpus hearing."  From the founding of the Republic through modern times, habeas corpus has served as a flexible remedy aimed at determining the lawfulness of custody.  In working through preliminary issues, this Court should be guided by the overriding principle of conducting a prompt and fair habeas hearing.  That principle, rationally applied within the context of this case, should result in reasonable discovery so Petitioner can prepare his case, an evidentiary hearing, a reasonable right to confront the

---

[1] All facts known to Petitioner's counsel about Petitioner are contained in Respondents' Notice of Filing of Combatant Status Review Tribunal Record, Exhibit A.

government's witnesses, and a significant burden imposed on the government to justify Petitioner's continued detention.

Petitioner proposes the following procedural framework: (1) Petitioner is entitled to an evidentiary hearing on any material factual issue in dispute; (2) the government should bear the burden of demonstrating to the Court the sufficiency of the evidence in support of the detention by clear and convincing evidence, and should not receive any presumption of sufficiency or validity based upon its prior unilateral determinations regarding Petitioner's "enemy combatant" status; (3) Petitioner is entitled to discovery through leave of court based on the needs in a particular case, and the government is obligated to produce all relevant exculpatory evidence; (4) hearsay evidence, while strongly disfavored, may be permitted consistent with the Federal Rules of Evidence and the habeas corpus statute, based upon the nature of the evidence offered, the Court's ability to assess its reliability and the specific facts and issues raised by this case; and (5) Petitioner has a right to confront the evidence against him and to meaningfully participate in the habeas proceedings.

## II. THE STRUCTURE OF THE HABEAS PROCEEDING.

Habeas corpus entitles a petitioner to a searching, independent inquiry into the lawfulness of his detention. *Ex parte Watkins*, 28 U.S. 193, 202 (1830) ("[T]he great object of [the writ] is the liberation of those . . . imprisoned without sufficient cause. It is in the nature of a writ of error, to examine the legality of the commitment"); *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490 (1973) (the writ is "a swift and imperative remedy in all cases of illegal restraint or confinement") (internal citations omitted). As the Supreme Court recently explained in *Boumediene v. Bush*, habeas entitles a prisoner to determine whether the respondent has sufficient statutory, constitutional or other lawful authority to detain. 128 S. Ct. 2229, 2266 (2008) (*citing INS v. St. Cyr*, 533 U.S. 289, 302 (2001)). In addition, the Court confirmed that,

2

in the executive detention context, habeas must provide a meaningful opportunity to challenge the factual basis for the detention. *Id.* at 2266–68, 2269 (because "the writ must be effective . . . [t]he habeas court must have sufficient authority to conduct a meaningful review of . . . the cause for detention"); *id.* at 2270 (habeas "includes some authority to assess the sufficiency of the Government's evidence against the detainee. [The court] also must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding").

The habeas corpus statute itself provides a basic framework for adjudicating all habeas petitions brought, as these petitions are, pursuant to 28 U.S.C. § 2241(c). That framework includes Petitioner's opportunity to traverse, or rebut, the government's proffered return to the writ, § 2243, ¶6, to undertake discovery where needed, § 2246, and to have disputed factual questions decided by an evidentiary hearing, § 2243, ¶7. The statutory framework thus reflects a court's plenary power to inquire into the lawfulness of the detention. *See Harris v. Nelson*, 395 U.S. 286, 293 (1969) ("The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary.") (internal quotations and citations omitted).

Many of the issues identified by the Court for discussion by the parties are not suitable for common resolution. This Court should establish Petitioners' baseline entitlement to procedural devices listed in its order – including discovery, confrontation and an evidentiary hearing on disputed factual questions, with the burden on the government to justify the legal and factual sufficiency of the bases for the detentions. But the actual application of such procedural devices will depend on the circumstances, and thus is best reserved for a decision based on the facts of this case.

Operating within this statutory framework, and guided by elementary due process principles, this Court can properly determine this habeas case while protecting the rights of both parties. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 526 (2004) (plurality op.) ("The simple outline of § 2241 makes clear both that Congress envisioned that habeas petitioners would have some opportunity to present and rebut facts and that courts in cases like this retain some ability to vary the ways in which they do so as mandated by due process"); 28 U.S.C. § 2243, ¶8 (authorizing district court judges to "dispose of the matter as law and justice require"). The framework reflects the reality that habeas, unlike many other forms of action, is at its core a flexible, adaptable remedy well-suited to address the particular circumstances of any individual case. *See Boumediene*, 128 S. Ct. at 2267 ("Habeas is not 'a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose.'") (quoting *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)).

**A. The Statutory Right of Habeas, 28 U.S.C. § 2241, Applies To This Petition**.

Petitioner invoked the Court's jurisdiction pursuant to 28 U.S.C. § 2241(c)(1), which authorizes challenges to the "custody under, or by color of authority of the United States." This provision codifies § 14 of the Judiciary Act of 1789, and thus mirrors the core common law process available to challenge the factual and legal authority to detain, *see INS v. St. Cyr*, 533 U.S. 289, 305 (2001), which, as *Boumediene* confirmed, exists for these Petitioners. 128 S. Ct. at 2262, 2274; *see also Rasul v. Bush*, 542 U.S. 466, 484 (2004) (remanding habeas petitions to district courts to consider "the merits of petitioners' claims").

Petitioner also invoked § 2241(c)(3), which separately authorizes challenges to "custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). In *Boumediene*, the Supreme Court held that the fundamental constitutional right to habeas corpus protected by the Suspension Clause applies to Guantanamo, *see Boumediene*, 128 S. Ct.

at 2253–58, rejecting the formalistic approach of the D.C. Circuit, which had declined to recognize any fundamental rights for persons detained "without property or presence in the United States," *see Boumediene* v. *Bush*, 476 F.3d 981, 991 (D.C. Cir. 2007). Thus, in addition to the common law habeas rights protected by § 2241(c)(1), Petitioner is now entitled to fundamental due process rights throughout the adjudication of his petitions. *See In re Guantanamo Bay Detainee Cases*, 355 F. Supp. 2d 443, 465 (D.D.C. 2005) (Green, J.) ("there can be no question that . . . the right not to be deprived of liberty without due process of law . . . is one of the most fundamental rights recognized by the U.S. Constitution").

The government contends that Guantanamo detainees are limited to "constitutional habeas," which the government interprets as a form of common law habeas as it existed in 1789. According to the government, any development in procedure after 1789 is not available to a Guantanamo detainee. This position is flawed.

First, the decision in *Boumediene* revives petitioner's statutory right to habeas under 28 U.S.C. § 2241, which incorporates its own procedural framework. In *Rasul* v. *Bush*, 542 U.S. 466, 483-84 (2004), the Supreme Court held that § 2241 applies to Guantanamo detainees. In response to that decision, the executive branch persuaded Congress to enact the Detainee Treatment Act of 2005 (DTA). Section 1005(e)(1) of the DTA amended § 2241 to eliminate habeas rights for Guantanamo detainees. The Supreme Court then held that DTA § 1005(e)(1) did not apply to this and other *pending* habeas petitions. *Hamdan* v. *Rumsfeld*, 548 U.S. 557, 576-77 (2006). The Executive next persuaded Congress to enact the Military Commissions Act of 2006 (MCA). Section 7(a) of the MCA amended 28 U.S.C. § 2241(e) to include the following provision: "No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who

has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."

The Supreme Court in *Boumediene* expressly declared MCA § 7 unconstitutional. 128 S. Ct. at 2274. The Court did not parse § 7 or limit its holding to "constitutional habeas." *See id.* at 2240 ("§ 7 of the [MCA] . . . operates as an unconstitutional suspension of the writ"); *id.* at 2274 ("MCA § 7 thus effects an unconstitutional suspension of the writ."); *id.* at 2275 ("The only law we identify as unconstitutional is MCA § 7."). The decision in *Boumediene* rendered MCA § 7 void. As a result, lower courts must apply the law without the unconstitutional provision. *See United States* v. *Klein*, 80 U.S. (13 Wall.) 128, 147-48 (1872) (disregarding an unconstitutional statute that divested the court of jurisdiction and reinstating a judgment obtained under prior statutory scheme); *accord Armstrong* v. *United States*, 80 U.S. (13 Wall.) 154 (1872) (same); Henry M. Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 HARV. L. REV. 1362, 1387 (1953) ("If the court finds that what is being done is invalid, its duty is simply to declare the jurisdictional limitation invalid also, and then proceed under the general grant of jurisdiction"). This Court should not narrow or modify the Supreme Court's express holding. "[I]t is [the Supreme] Court's prerogative alone to overrule one of its precedents." *State Oil Co.* v. *Khan*, 522 U.S. 3, 20 (1997).

Prior to enactment of MCA § 7, *Rasul* and *Hamdan* made clear that Guantanamo detainees have a right to invoke the statutory habeas corpus procedure under 28 U.S.C. § 2241. This Court must now read § 2241 without subsection (e)(1), which is the codification of MCA § 7. A plain reading of that statute without subsection (e)(1), as confirmed by *Rasul*, gives Guantanamo detainees a statutory right of habeas corpus.

Second, even if § 2241 does not apply directly, the procedural framework developed under that statute should apply as a matter of discretion. The government's position that procedural developments in habeas are frozen as of 1789 is unsound. Improved procedures give courts a better means of reaching the correct result under the substantive law. It would be unreasonable to repudiate those procedures because they were unknown in 1789. The Court should invoke the procedural techniques adapted for jurisprudence in the modern world. Those techniques are outlined in the following section.

## B. The Federal Habeas Corpus Statutes, 28 U.S.C. §§ 2243-48, Provide The Basic Procedural Framework To Govern This Case.

Regardless of the source of the detainee's substantive rights, the habeas corpus statutes sets out the basic framework for adjudicating all challenges to federal executive detention brought under § 2241(c).[2] Indeed, a portion of the framework has already been applied in Guantanamo cases. In the consolidated cases before Judge Green and in later Guantanamo cases, the government was ordered to produce "the return certifying the true cause of the detention," pursuant to 28 U.S.C. § 2243, ¶ 3. The next step in the statutory process (one that was arrested by the stays pending appeals of various legal questions) entitles the petitioner to traverse the return or, in other words, to "deny any of the facts set forth in the return or allege any other material facts." *Id.* § 2243, ¶ 6; *cf.* § 2248 ("allegations of a return . . . *if not traversed*, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true") (emphasis added). Amendments to the return or the traverse are permissible by leave of court, *id.* § 2243, ¶ 7. This Court issued an Order allowing petitioner to file a traverse on or

---

[2] *See, e.g.*, *Hamdi* v. *Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality opinion) ("[A]ll agree that § 2241 and its companion provisions provide at least a skeletal outline of the procedures to be afforded a petitioner in federal habeas review.").

before October 6, 2008. The statute also expressly authorizes the taking of discovery in certain circumstances. *Id.* § 2246; *see also infra*, Part G. Ultimately, the court must "summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243, ¶ 8. Remedies available to the court include a discharge where, "on the facts admitted, it may appear that, as a matter of law, the prisoner is entitled to the writ." *Walker* v. *Johnston*, 312 U.S. 275, 284 (1941); *see also Boumediene*, 128 S. Ct. at 2266.

In summary, the statute provides the basic operating structure to manage these cases. Courts can augment that structure as required by the circumstances of a given case. Ultimately, because "there is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus," courts must fill in the "necessary facilities and procedures for an adequate inquiry." *Harris* v. *Nelson*, 394 U.S. 286, 291, 300 (1969). The Supreme Court has explained:

> The scope and flexibility of the writ – its capacity to reach all manner of illegal detention – its ability to cut through barriers of form and procedural mazes – have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

*Id.* at 291.

## C. The Government's Proposed Procedural Framework Is Not Legally Sound.

In place of the governing habeas statute, the government seeks to impose a narrow and rigid framework that it argues is compelled by the plurality opinion in *Hamdi* v. *Rumsfeld*, 542 U.S. 507 (2004). The government's proposed framework was not mandated by *Hamdi*, and it would give the government advantages neither authorized by statute nor permitted by due process, including an undefined presumption in favor of the government's evidence, a presumption in favor of hearsay, and a prohibition against discovery.

*Hamdi*'s suggested procedures relied upon by the government are dicta. The *Hamdi* Court did not say, for instance, "hearsay is admissible." It said, "Hearsay . . . may need to be accepted as the most reliable evidence from the Government in such a proceeding." 542 U.S. at 533-34. The plurality wisely left the details to trial judges, for appropriate balancing of the competing interests in light of the circumstances prevailing at the time. Significantly, the *Hamdi* decision was issued more than four years ago, much closer to the period of "active combat operations" in Afghanistan, and Hamdi himself was an alleged Taliban fighter captured on the battlefield. The government's interest in avoiding judicial intrusions on battlefield operations was far stronger at that time, and for that detainee.

As dicta, the *Hamdi* procedures are not controlling on this Court. They are rendered significantly less persuasive by Justice Souter's concurrence. Justice Souter refused to accept the plurality's suggestion that the government could be entitled to a presumption or that the burden of proof could fall on the petitioner. *See* 542 U.S. at 553 (Souter, J., concurring) ("It should go without saying that in joining with the plurality to produce a judgment, I do not adopt the plurality's resolution of constitutional issues that I would not reach. . . . I do not mean to imply agreement that the Government could claim an evidentiary presumption casting the burden of rebuttal on Hamdi").

Nothing in *Marks* v. *United States*, 430 U.S. 188 (1977), lends any support to the government's position that dicta in a plurality opinion – dicta specifically disclaimed by two concurring justices whose votes were necessary to the judgment – is transformed into binding precedent by Justice Thomas's dissent. In *Marks*, the Supreme Court observed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members

who *concurred in the judgments* on the narrowest grounds." 430 U.S. at 193 (emphasis added; citations and quotations omitted). Justice Thomas *dissented* in *Hamdi*. His opinion cannot be used to transform a plurality opinion into a binding precedent. *See also King* v. *Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (*en banc*) ("*Marks* is workable – one opinion can be meaningfully regarded as 'narrower' than another – only when one opinion is a logical subset of other, broader opinions"). Indeed, the Supreme Court in *Boumediene* flatly rejected the argument that the *Hamdi* plurality's suggested procedures are binding precedent. "Setting aside the fact that the relevant language in *Hamdi* did not garner a majority of the Court, it does not control the matter at hand." *Boumediene*, 128 S. Ct. at 2269.

Furthermore, even the *Hamdi* plurality opinion does not support the government's position. There is no rigid "*Hamdi* Framework" that can be applied across the board to all "war on terror" habeas cases. Rather, as stated in Judge Traxler's controlling opinion in the Fourth Circuit's recent *en banc* decision in *Al-Marri* v. *Pucciarelli*, *Hamdi* sets forth one particular fact-based application of a *Mathews* v. *Eldridge* due process balancing framework. *See Al-Marri* v. *Pucciarelli*, __F.3d __, 2008 WL 2736787, at *31 (4th Cir. July 15, 2008) (Traxler, J., concurring) (noting that the *Hamdi* plurality does not impose "a cookie-cutter procedure appropriate for every alleged enemy-combatant"). As *Boumediene* recognized, habeas is an "adaptable remedy. Its precise application and scope changed depending upon the circumstances." 128 S. Ct. at 2267.

The balancing test of *Mathews* v. *Eldridge*, as adopted by the Supreme Court in *Boumediene* and in the plurality opinion in *Hamdi*, requires consideration of "the risk of an erroneous deprivation of [a liberty interest] and the probable value, if any, of additional or substitute procedural safeguards." *Boumediene*, 128 S. Ct. at 2268 (quoting *Mathews* v.

*Eldridge*, 424 U.S. 319, 335 (1976)); *see also Hamdi*, 542 U.S. at 529.   Petitioner's liberty interests has grown as the years of indefinite detention have worn on, while the government's national security interests with respect to this particular detainee has become weaker and more remote.

It is the government's burden to show – not through generalized and unsupported assertions, but through a specific showing targeted to a particular petitioner's case – that any deviation from the "normal way" is warranted. *Al-Marri*, 2008 WL 2736787 at *47 (Traxler, J., concurring).   Although the specific procedures warranted in any one case may differ depending on the circumstances, certain differences between this case and *Hamdi* can be identified that suffice to reject the government's blanket approach.

The risk of misclassifying Hamdi was much lower than the risk in this case:  Hamdi was captured in a "foreign combat zone" carrying an assault rifle as part of a "Taliban unit," 542 U.S. 512-13, 523; *see also id.* at 549 (Souter, J., concurring) (Hamdi "was taken bearing arms on the Taliban side of a field of battle ").   In contrast, Petitioner in this case was never a member of a fighting unit.  Rather; he was a member of President Karzai's security force, who was aspiring to become an officer in a unit loyal to President Karzai and under the control of the Governor of the region, who himself was appointed by President Karzai.  He was awakened and arrested while visiting his brother.

Additionally, Petitioner's rights as an alien are not more limited than Hamdi's as a citizen.   Detainees held at Guantanamo have fundamental due process rights.   Relying again upon *Johnson v. Eisentrager*, 339 U.S. 763 (1950), a case distinguished away by *Rasul* and *Boumediene*, the government claims that "*Boumediene* did not upset the well-established holding that the Fifth Amendment and other individual rights secured by the Constitution do not apply to

alien enemy combatants lacking any voluntary connection to the United States." *Gov't Br. at 11*. Thus, the government implies, whatever restricted procedures were available for Hamdi, "must be good enough for an alien." *Gov't Br. at 8*. The government's premise is incorrect.

Judge Green ruled in the cases previously transferred to her for coordinated consideration that the detainees at Guantanamo have rights under the Fifth Amendment. *See In re Guantanamo Bay Detainee Cases*, 355 F. Supp. 2d at 465. The government appealed that ruling, but the applicability of the Fifth Amendment was not addressed on appeal. It is therefore the law of the case in the cases in which it was entered. *See Kimberlin* v. *Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) ("the same issue presented a second time in the same case in the same court should lead to the same result") (quoting *LaShawn A.* v. *Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (*en banc*)). But even as to the cases, such as this case, that were not before Judge Green, the Supreme Court in *Boumediene* relied heavily on the line of cases, including the *Insular Cases*, that applied fundamental rights in territories controlled by the United States. *See Boumediene*, 128 U.S. at 2254-57, and cases cited therein; *see also id.* at 2261 ("In every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States"). Thus, detainees at Guantanamo are entitled to fundamental rights, and there is no right more fundamental than the right not to be deprived of liberty without due process of law. *See Foucha* v. *Louisiana*, 504 U.S. 71, 80 (1992); *In re Guantanamo Bay Detainee Cases*, 355 F. Supp. 2d at 465.

For all these reasons, this Court is not confined by *Hamdi* to apply a set of procedures outlined in dicta by a plurality decision in a different context.

## III. THE LEGAL AUTHORITY FOR DETENTION AND THE BURDEN OF PROOF FOR ESTABLISHING THAT THE DETENTION IS LAWFUL.

### A. The Executive Has No Authority To Detain Beyond What Is Specifically Covered By The Laws Of War Or Legislative Enactment.

When Congress delegates military power to the Executive, the laws of war define the scope of that power. *Hamdan* v. *Rumsfeld*, 548 U.S. 547 (2006) (relying on law of war to interpret Article 21 of Uniform Code of Military Justice); *Hamdi* v. *Rumsfeld*, 542 U.S. 507, 517-19 (2004) (plurality relying on international law of war for definition of enemy combatant); *In re Quirin*, 317 U.S. 1, 27-28 (1942) (Court has "recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as enemy individuals").

The enabling legislation applicable to this case is the Authorization to Use Military Force (AUMF), 115 Stat. 224 (2001), which authorized the President to:

> use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided *the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons*, in order to prevent any future acts of international terrorism against the United States *by such nations, organizations or persons.*

AUMF § 2(a) (emphasis added).[3]  Significantly, Congress refused the President's attempts for broader authority that would have "authorized the President to use force not only against the perpetrators of the September 11 attacks, but also against anyone who might be considering future acts of terrorism, as well as against any nation that was planning "aggression" against the United States."  Abramowitz, *The President, the Congress, and Use of Force: Legal and*

---

[3] The legislative record confirms the AUMF's limitation to entities and persons connected to September 11. *See, e.g.*, 147 Cong. Rec. S9417 (Sen. Feingold) (the AUMF "is appropriately limited to those entities involved in the attacks that occurred on September 11") (daily ed. Sept. 14, 2001); *id.* at S9416 (Sen. Levin) ("[The AUMF] is limited to the nations, organizations, or persons involved in the terrorist attacks of September 11. It is not a broad authorization for the use of military force against any nation, organization, or persons who were not involved in the September 11 terrorist attacks.").

*Political Considerations in Authorizing the Use of Force Against International Terrorism,* 43

HARV. INT'L L.J. 71, 73 (2002).  Because the final AUMF included no direct detention power,

the only detention authority delegated to the Executive was the implicit power recognized under

the laws of war, limited to the enemy Congress specifically defined in the AUMF.

Detention power exists first and foremost as to "combatants":  persons who join "the

military arm of the enemy government."  *Hamdi,* 542 U.S. at 519; *see also Quirin,* 312 U.S. at

37-38.  United States treaties and international law generally recognize a power to detain

"members of the armed forces of a Party to a conflict."  Protocol Additional to the Geneva

Conventions of 12 August 1949, and Relating to the Protection of Victims of International

Armed Conflicts, June 8, 1977, art. 43(2), 1125 U.N.T.S. 3 ("Additional Protocol I"); *see*

*generally* Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949,

art. 4(A)(1), 6 U.S.T. 3316, 3320, T.I.A.S. No. 3364 ("Third Geneva Convention"); 1 Henckaerts

& Doswald-Beck, *Customary International Humanitarian Law* 11 (2005).[4]

Military detention power over civilians is far narrower.  An individual who is not a

"combatant" under the laws of war is a "non-combatant" or "civilian."  Additional Protocol I, art.

50 (defining "civilian" as any person who does not fall under identified sections of article 4 of

the Third Geneva Convention or article 43 of Additional Protocol I).  The laws of war prohibit

the use of military force against civilians unless and for such time as they actually "take a direct

part in hostilities."  Third Geneva Convention, art. 3, 6 U.S.T. 3316 (prohibiting military force

against civilians "taking no active part in the hostilities"); Protocol Additional to the Geneva

Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International

---

[4] Combatants are permitted to use force against other combatants and are generally immune from criminal prosecution for the use of force in wartime. *See* Additional Protocol I, art. 43(2) (combatants "have the right to participate directly in hostilities").  Of course, combatants may be prosecuted for conduct that violates the laws of war. *See, e.g., Quirin,* 317 U.S. at 31.

Armed Conflicts, June 8, 1977, art. 13(2)-(3), 1125 U.N.T.S. 609 ("Additional Protocol II") (civilian population "shall not be the object of attack" "unless and for such time as they take a direct part in hostilities").

Thus, detention power exists where the prisoner, although a civilian, actually and directly participated in the international armed conflict authorized by Congress – referred to variously as "combat" or "hostilities." This participation must be *direct and military*. *E.g.*, Message from the President Transmitting Two Optional Protocols to the Convention on the Rights of the Child, S. Treaty Doc. No. 106-37, at VII (2000) ("The United States understands the phrase 'direct part in hostilities' to mean immediate and actual action on the battlefield likely to cause harm to the enemy because there is a direct causal relationship between the activity engaged in and the harm done to the enemy"). Mere sympathizers – even those whom a commander suspects might take part in hostilities in the future – are not subject to military force. *See* Int'l Comm. Of the Red Cross, Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949 at 619 (Claude Pilloud, *et al.* eds. 1987); S. Exec. Rep. No. 107-4, at 7 (2002) ("training," "combat support," and "combat service support" are not direct participation in hostilities).

The Supreme Court has recognized this distinction. *Compare Hamdi*, 542 U.S. at 522 n.1 (member of Taliban military unit who allegedly carried weapon against U.S. troops subject to military detention) *with Ex parte Milligan*, 71 U.S. 2 (1866) (confederate sympathizer who sought overthrow of government during wartime, but did not engage in battlefield activity, was not subject to military detention). It is based on one of the founding principles of the Republic: "a deep distrust of executive military power and military tribunals." *Loving* v. *United States*, 517 U.S. 748, 760 (1996); *see also United States ex rel. Toth* v. *Quarles*, 350 U.S. 11, 14 (1955)

("[A]ssertion of military authority over civilians cannot rest on the President's power as commander-in-chief, or on any theory of martial law."). Moreover, because Congress refused to grant the President's request for a broad authorization of force against civilians in the AUMF, the Executive's authority is at its "lowest ebb." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 637-38 (Jackson, J., concurring).

## B. The Department of Defense Cannot Expand Military Detention Power By Rule.

The government claims that this Court "must accord substantial deference to the Executive's interpretation of its authority under the AUMF," *Gov't Br. at 15*, but the government never identifies the Executive's interpretation at issue. In prior litigation, including *Parhat*, the government has relied on an expanded definition of "enemy combatant" utilized by the DoD in CSRT proceedings.

The Department of Defense had no power to expand the President's military detention power by promulgating a rule broadening the definition of "enemy combatant." An agency's power is limited by Congressional delegation. *Louisiana Public Serv. Comm'n* v. *FCC,* 476 U.S. 355, 374 (1986); *Railway Labor Executive Ass'n* v. *National Mediation Bd.,* 29 F.3d 655 (D.C. Cir. 1994) (en banc). Quasi-legislative power (for example, expanding existing law as to who may be detained by the military) must be "rooted in a grant of . . . power by the Congress and subject to limitations which that body imposes." *See Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 (1979). In this case, the power to name the enemy in warfare is constitutionally delegated to Congress. U.S. Const. art. I, § 8, cl. 11; *see Hamdi,* 542 U.S. at 552 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment). Congress was exceedingly careful in defining the enemy. When the President sought leave to use force against persons unconnected with September 11 "'to deter and pre-empt any future acts of terrorism and aggression against the United States,'" Congress declined, and instead defined the enemy only by express reference

to the September 11 attacks. Abramowitz, *supra*, 43 HARV. INT'L L.J. at 73 (quoting Draft Joint Resolution Authorizing the Use of Force). Congress expressed its intention to define the enemy in one way *and not another,* and to impose military force (including detention) upon that enemy *and not another.* The Department of Defense had no power to revoke Congress's constitutional prerogative by rule.

**C. The Executive Has No Inherent Authority To Detain Beyond The Laws Of War Or Statutory Delegation.**

The government contends that the President has "authority to capture and detain enemy combatants in wartime" pursuant to his "independent constitutional powers as Commander-in-Chief." The Supreme Court was unwilling to reach that question in *Hamdi. See* 542 U.S. at 516-17. Instead, the plurality concluded that "individuals who fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported the al Qaeda terrorist network responsible for those attacks, are individuals Congress sought to target in passing the AUMF." The Supreme Court's refusal to expand the President's detention powers any more than necessary counsels equal caution by this Court.

Even if the President has independent Article II powers of detention, however, those powers would be confined by the laws of war and by the limitations imposed by Congress. *See, e.g., Little* v. *Barreme*, 6 U.S. (2 Cranch) 170 (1804) (where Congress authorized capture of ships traveling to French ports in "imperfect war," President could not authorize detention of ships traveling from French ports such that military captain who seized such a ship would be immunized from civil damages); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952) (President's seizure of steel mills to preserve military supply lines during time of war contravened act of Congress and was enjoined). The President "may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers." *Hamdan,*

126 S. Ct. at 2774 n.23; *see also* U.S. Const., art. I, § 8 ("Congress shall have Power . . . To declare War . . . and make Rules concerning Captures on Land and Water; . . . To raise and support Armies . . .; To provide and maintain a Navy; [and] To make Rules for the Government and Regulation of the land and naval Forces"). As set forth above, the laws of war do not permit the President to detain any person he chooses. And Congress alone has the constitutional authority to define the enemy by virtue of its power to declare war. Congress's definition of the "enemy" in this conflict is both narrow and specific. It is limited to persons, organizations or nations that were in some way involved with the terrorist attacks of September 11, 2001. Contrary to the government's contention, Congress was "purporting to limit" the powers of the President by refusing to grant the President all the power he wanted. *See Abramowitz, supra.* The facts will show that Petitioner does not meet the definition of an enemy combatant under the laws of war, nor does he fall within the scope of the AUMF. Accordingly, the military has no authority to detain him in this case.

## D. The Court of Appeals' Decision In Parhat Serves As The Outer Limit Of The Government's Authority To Detain.

In *Parhat v. Gates*, 2008 U.S. App. LEXIS 13721, 2008 WL 2576977 (D.C. Cir. 2008), the Court of Appeals considered a Guantanamo detainee's motion for judgment in connection with his DTA petition. The government contended that the detainee was a member of the East Turkistan Islamic Movement (ETIM); that ETIM was associated with al Qaeda and the Taliban and that it was designated as a terrorist organization by the State Department and the United Nations; and that ETIM engaged in hostilities against the United States and its coalition partners. The Court, for purposes of the motion for judgment only, considered the evidence under Department of Defense's more expansive definition of an enemy combatant: "an individual who was part of or supporting Taliban or al Qaida forces, *or associated forces* that are engaged in

hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." Even under this definition, the parties agreed, and the Court declared, that the government needed to show:

> (1) the petitioner was part of or supporting "forces"; (2) those forces *were associated* with al Qaida or the Taliban; *and* (3) those forces *are engaged* in hostilities against the United States or its coalition partners. In Parhat's case, this means that the government must show that: (1) Parhat was part of or supporting ETIM; (2) ETIM *was associated* with al Qaida or the Taliban; *and* (3) ETIM *is engaged* in hostilities against the United States or its coalition partners.

(Emphasis added). Petitioner emphasizes that this test, urged by the government, was not necessarily the proper test, nor did the Court of Appeals hold that it was. Rather, the Court of Appeals assumed the applicability of the government's test in *Parhat*. Therefore, that test serves as the outer limit of the government's authority to detain in this case.

## IV. THE STANDARD FOR OBTAINING AN EVIDENTIARY HEARING.

### A. Petitioner Is Entitled To An Evidentiary Hearing.

The government's position on an incremental process of hearings violates the *Boumediene* Court's directive that the "detainees in these cases are entitled to a prompt habeas corpus hearing." The only way to ensure that Petitioner's habeas process proceeds expeditiously is to schedule a prompt hearing; to consider all admissible evidence at that hearing; and to issue a ruling that will serve as a final judgment and complete a full record for review on appeal.

The right to an evidentiary hearing is grounded in well settled habeas law. The habeas statute both entitles a Petitioner to traverse the factual allegations contained in the government's return and anticipates a judicially-managed procedure to settle the factual disputes the court deems material to the resolution of the ultimate question at issue: the legality of the detention.

Habeas procedure expressly contemplates resolution by evidentiary hearing. The Supreme Court explained: "The Government properly concedes that if the petition, the return, and the traverse raise substantial issues of fact *it is the petitioner's right to have those issues heard* and determined in the manner the statute prescribes." *Walker* v. *Johnston*, 312 U.S. at 286 (emphasis added); *accord Blackledge* v. *Allison*, 431 U.S. 63 (1977); *see also Johnson* v. *Zerbst*, 304 U.S. 458, 466-67 (habeas petitioner is entitled to "a judicial inquiry into the very truth and substance of the causes of the detention. . . . [s]uch a judicial inquiry involves the reception of testimony").[5]

Indeed, the need for evidentiary hearings to resolve factual disputes is acknowledged throughout habeas corpus jurisprudence. *See Boumediene*, 128 S. Ct. at 2266 (explaining that § 2241 "accommodates the necessity for factfinding that will arise in some cases" by authorizing an appellate court to transfer a case to a district court "whose institutional capacity for factfinding is superior to his or her own"); *Stewart* v. *Overholser*, 186 F.2d 339, 342 (D.C. Cir. 1950) ("When a factual issue is at the core of a detention challenged by an application for the writ it ordinarily must be resolved by the hearing process. This is a chief purpose of the habeas corpus proceeding."); *id*. at 342-43 (collecting cases); *Kendzierski* v. *Brantley*, 447 F.2d 806, 808 (7th Cir. 1971) (Stevens, J.) ("Both parties – not just one – should be afforded an opportunity to argue the relevant facts to the district court. Only after that has been done will it be possible to determine whether an evidentiary hearing is necessary.").

Moreover, the Supreme Court in *Boumediene* clearly recognized the obligation of the district court to conduct de novo hearings to decide contested factual questions. First, the Court

---

[5] Even assuming any relevance of historical practice to these statutory cases, the government's conclusion that evidentiary hearings and live testimony were uncommon at common law is incorrect. *See, e.g. Boumediene*, 128 S. Ct. at 2268 (citing cases).

held insufficient the procedures contemplated by the Detainee Treatment Act, which only provided for appellate record review of the sufficiency of the evidence that *had been* considered by a Combatant Status Review Tribunal; the Supreme Court instead required the government to justify to a district court in a plenary proceeding the sufficiency of the evidence to detain each Petitioner. 128 S. Ct. at 2270. Similarly, the Court held that petitioners must be allowed to submit exculpatory evidence obtained subsequent to a CSRT determination that might prove a detainee was improperly classified as an "enemy combatant." *Id.* The Court would not have ordered the opportunity to present new factual evidence, and would not have bothered to strike down an act of Congress limiting such ability, if the Court did not contemplate full consideration of the factual evidence and, ultimately, the potential for a release from detention based upon it.

As part of the traverse and hearing process, Petitioner is entitled to present any credible evidence that may reasonably bear on his "enemy combatant" designation, including evidence that a confession from the detainee or the statements of persons implicating him was procured by torture. *See Whaley* v. *Johnston*, 316 U.S. 101, 104 (1942) (holding that petitioner is entitled to a hearing on "the material issue whether the plea was in fact coerced by the particular threats alleged"); *accord Machibroda* 368 U.S. at 493 ("There can be no doubt that, if the allegations [regarding coercion] contained in the petitioner's motion and affidavit are true, he is entitled to have his sentence vacated"); *see also Overholser*, 186 F.2d at 345 (ordering factual hearing "involving the taking of testimony followed by a decision based on the facts and the law" regarding the petitioner's sanity).

The government adopts an extremely one-sided position that "evidentiary proceedings should be allowed only when the court determines that, absent an evidentiary hearing, and affording the government's evidence a presumption of validity, the petitioner has nonetheless

submitted 'more persuasive evidence' . . . such that the weight of the evidence supports the habeas petitioner." Gov't Br. at 39. This standard violates the teaching of *Warden v. Oregon*, 412 U.S. 470, 475 (1972) (due process requires reciprocal procedural rights to avoid unfair advantage). The Government's position does not encompass reciprocal rights. It requires the Petitioner to prove his case without an evidentiary hearing (establishing the "weight of the evidence" supports him) before he is entitled to prove his case through an evidentiary hearing. The opposite is true for the government. It receives a presumption of validity, and if it loses at that point, can proceed to an evidentiary hearing.

District courts are well equipped to use their discretion to deny an evidentiary hearing if it deems the government's or Petitioner's allegations to be "vague, conclusory or palpably incredible." *Machibroda v. United States*, 386 U.S. 487, 495 (1962). But an evidentiary hearing is required if "the petition, the return, and the traverse raise substantial issues of fact." *Walker* v. *Johnston*, 312 U.S. 275, 286 (1941). "If a detainee can present reasonably available evidence demonstrating there is no basis for his continued detention, he must have the opportunity to present this evidence to a habeas corpus court." *Boumediene*, 128 S. Ct. at 2273.

## V. THE BURDENS OF PRODUCTION AND PERSUASION.

### A. The Government Has The Burden Of Proving The Factual Basis for Detention By Clear And Convincing Evidence.

In *Boumediene*, although the Court recognized that the government bears the burden of justifying the detention, it left open for the district courts to decide the "*extent* of the showing required of the Government in these cases." 128 S. Ct. at 2271. Habeas is a broad, equitable remedy, which imposes on the judiciary the obligation to "dispose of the case as law and justice require." 28 U.S.C. § 2243. In the executive detention context, where the "protections [of the writ] have been strongest," *St. Cyr*, 533 U.S. at 301. Petitioner maintains that "law and justice

require" that the government bear the burden of demonstrating the lawfulness of his detention by clear and convincing evidence. Because of the absence of any competent or neutral adjudicatory process under which Petitioner's status has been determined, the substantial liberty interests at stake in their continuing detention, and the "considerable risk of error" associated with the detentions at Guantanamo, *Boumediene*, 128 S. Ct. at 2270, nothing short of demonstrating the factual sufficiency of the detention by this exacting standard would satisfy the high command of the writ in these cases. As the Court of Appeals has explained:

> [I]n situations where the various interests of society are pitted against restrictions on the liberty of the individual, a more demanding standard is frequently imposed, such as proof by clear, unequivocal and convincing evidence.

*In re Ballay*, 482 F.2d 648, 662 (D.C. Cir. 1973).

The federal habeas cases certainly do not suggest that Petitioner bears the burden of proof to demonstrate his factual innocence and that he must do so by a preponderance of the evidence. Such a reading of the caselaw ignores the unique context of the Guantánamo Bay detentions.

First, Petitioners are not collaterally attacking the judgment of a prior competent court of record. *Compare Ex parte Watkins*, 28 U.S. 103 (1833) (recognizing limitation on habeas courts' authority to review factual judgments of "court of competent jurisdiction") *with Boumediene*, 128 S. Ct. at 2268 ("The present cases fall outside these categories, however; for here the detention is by executive order"); *see also id.* at 2264 (explaining that "cases discussing implementation of [AEDPA] give little instruction (save perhaps by contrast) for the instant cases, where no trial has been held"). Instead, they seek the core protections of habeas to review the executive's *unilateral* decision to detain them. Thus, in contrast to a habeas petition challenging a criminal conviction, the executive has not already demonstrated to the satisfaction of a neutral adjudicator that the evidence is sufficient to meet the executive's asserted need for

detention. "In this context, the need for habeas corpus is more urgent." *Boumediene*, 128 S. Ct. at 2269. Through habeas, the executive must satisfy a court, for the first time, that it has a sufficient factual basis to detain Petitioner. *In re Winship*, 397 U.S. 358, 364 (1970) ("Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt").

Second, the deprivation of liberty in this case is severe. Petitioner is nearing six years of detention without charge. Because the asserted war under which the executive branch claims authority to detain could last "a generation or more," *Boumediene*, 128 S. Ct. at 2238, Petitioner faces the prospect of a life sentence justified by what so far has been nothing more than selective review by the Executive of the evidence that it has unilaterally chosen to consider. The brutal conditions in which Petitioner is detained – devoid of contact with loved ones, subject to isolation, despair, and psychological damage – only magnify the consequences of the Executive's claimed authority to detain, and highlight the corresponding need for robust judicial review. Petitioner cannot be made to endure such grievous deprivation of liberty[6] "upon no higher degree of proof than applies in a negligence case." *Woodby* v. *INS*, 385 U.S. 276, 285 (1966).

---

[6] Although it is difficult to quantify the extent of human suffering endured by the Petitioners who have been subject to the government's program of interrogation and disorientation and who are held in the cramped cells of the Guantanamo prison camp, numerous institutions believe these conditions represent a serious human rights concern. *See, e.g.,* Amnesty Int'l, *Conditions of isolation for detainees at Guantánamo Bay*, at 4 (April 2007) ("the cells have no access to natural light or air, and are lit by fluorescent lighting which is on 24 hours a day and controlled by guards"); *Locked Up Alone: Detention Conditions and Mental Health at Guantanamo*, Human Rights Watch, June 2008, at 2, 34, 37 (describing the severe mental deterioration of many of the 185 detainees held in "supermax-security" conditions in Guantanamo, including hallucinations, multiple suicide attempts, and an "an array of painful and incapacitating psychiatric symptoms"); *Broken Laws, Broken Lives: Medical Evidence of Torture by US Personnel and Its Impact*, Physicians for Human Rights, June 2008 (documenting severe psychological and physical effects of certain prisoners subject to Guantanamo's interrogation regime).

The Supreme Court has repeatedly held that, where the government seeks to impose similarly substantial deprivations of liberty, the government must justify the sufficiency of its case by clear and convincing evidence. *See Woodby*, 385 U.S. at 286 (deportation); *Schneiderman v. United States*, 320 U.S. 118 (1943) (denaturalization); *Kansas v. Hendricks*, 521 U.S. 346, 353 (1997) (indefinite civil commitment of sex offender); *Foucha v. Louisiana*, 504 U.S. 71, 81 (1992) (continued commitment of criminal defendant found not guilty by reason of insanity); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (pre-trial detention based on dangerousness).

Finally, as *Boumediene* expressly recognizes, these cases have presented a "considerable risk" of erroneous detention. 128 S. Ct. at 2270. Indeed, despite claims of the administration in 2002 and 2003 that all the detainees were the "worst of the worst," it is now beyond argument that there are many innocent men detained at Guantanamo. As early as 2002, the former Guantanamo commander stated that "[s]ometimes we just didn't get the right folks," yet "[n]obody wants to be the one to sign the release papers. There's no muscle in the system."[7] A 2002 CIA report similarly concluded that "a substantial number of the detainees appeared to be either low-level militants . . . or simply innocents in the wrong place at the wrong time."[8] Media

---

[7] Christopher Cooper, *Detention Plan: In Guantanamo, Prisoners Languish in a Sea of Red Tape*, Wall St. J., Jan. 26, 2005, at A1, A10. *See also Frontline: Son of Al Qaeda* (PBS television broadcast, Apr. 11, 2004), transcript available at http://www.pbs.org/wgbh/pages/frontline/shows/khadr/interviews/khadr.html (quoting CIA operative who had spent a year undercover at Guantanamo as estimating that "only like 10 percent of the people that are really dangerous, that should be there and the rest are people that don't have anything to do with it, don't even, don't even understand what they're doing here"); Tom Lassetter, *America's Prison for Terrorists Often Held the Wrong Men*, McClatchy Newspapers, June 15, 2008, *available at* http://www.mcclatchydc.com/detainees/story/38773.html (quoting U.S. intelligence analyst, "Over about three years, I assessed around 40 of these individuals, mostly Afghans. . . . I only can remember recommending that ONE should be kept at GITMO").

[8] *See also* Tim Golden & Don Van Natta, Jr., *U.S. Said to Overstate Value of Guantanamo Detainees*, N.Y. Times, Jun. 21, 2004 (also reporting that "[o]fficials of the Department of Defense now acknowledge that the military's initial screening of the prisoners for possible shipment to Guantanamo was flawed"); Chris Mackey & Greg Miller, *The Interrogators* 85 (2004) (according to account of interrogators who worked at Kandahar Air Force Base in 2002 "every Arab we encountered was in for a long-term stay and an eventual trip to Cuba").

and academic studies of Defense Department data and CSRT decisions concluded that many

detainees denominated "enemy combatants" did not belong at Guantanamo:

> A high percentage [of the detainees] . . . were not captured on any battlefield . . . . Fewer than 20 percent . . . have ever been Qaeda members. Many scores, and perhaps hundreds, of the detainees were not even Taliban foot soldiers, let alone Qaeda terrorists. They were innocent, wrongly seized combatants with no intention of joining the Qaeda campaign to murder Americans.[9]

The feared risk of wrongful detention is in fact a stark reality, weighing heavily in favor of a

meaningful burden upon the government to offer proof to support continued detention.

Clear and convincing in this context refers both to the quantum of evidence – that is, a

standard higher than preponderance but less than beyond a reasonable doubt – and to the quality

of evidence, a substantial concern in Petitioner's case. *See, e.g. Parhat v. Gates*, 532 F.3d 834,

2008 WL 2576977, at *11 (documents supporting authority to detain petitioner Parhat

"repeatedly describe [his] activities and relationships as having 'reportedly' occurred, as being

'said to' or 'reported to' have happened, and as things that 'may' be true or are 'suspected of'

having taken place. But in virtually every instance, the documents do not say who 'reported' or

'said' or 'suspected' those things"); Declaration of Stephen Abraham, Lieutenant Colonel, U.S.

Army Reserve, Joint Appendix, *Boumediene v. Bush*, No. 06-1195, at 103 (evidence provided to

the CSRT panel on which he served "lacked even the most fundamental earmarks of objectively

credible evidence.").

Recognizing that these cases implicate "special circumstances," the government proposes

a burden-shifting scheme. Gov't Br. at 19. The government claims that standards applicable in

other pretrial detention contexts are not pertinent to military detention for "the security of the

---

[9] Stuart Taylor, Jr., *Falsehoods About Guantanamo*, Nat'l J. Feb. 4, 2006, at 13; Corine Hegland, *Who Is at Guantanamo Bay*, Nat'l J., Feb. 4, 2006, at 33-35.

nation itself." *Id.* at 20.  These concerns, however, are no longer applicable to hearings conducted almost six years after detention began and 8,000 miles from the place of seizure.

This Court does not need to decide what process is due and what burdens must be met at a battlefield hearing conducted in Afghanistan circa December 2001.  This hearing will be held in Washington D.C. in 2008 or 2009.  The entire Department of Justice is available for preparation of the government's case.  The government has had unfettered access to the detainee for almost six years.  The government, unlike Petitioner, has access to vast intelligence and military resources accumulated during seven years of massive government operations in Afghanistan and surrounding countries.  A clear and convincing standard will not interfere with the military's mission.

The Court should require the government to prove its authority to detain Petitioner by clear and convincing evidence.

## VI. THE STANDARD GOVERNING HEARSAY EVIDENCE.

### A. Hearsay May Be Admissible In Limited Contexts.

The question of whether to admit hearsay is best left to a time when the Court can measure the reliability of the proffered evidence in concrete circumstances.  In general, however, Petitioner suggests that the Court should be wary of admitting critical evidence as hearsay.

Centuries of legal experience have taught that hearsay is a particularly unreliable form of evidence.  *See Ellicott* v. *Pearl*, 35 U.S. 412, 436 (1836). The common law thus developed a strong preference against the use of hearsay, and allowed only certain, narrowly-defined exceptions for declarations made in circumstances tending to lend them particularized guarantees of trustworthiness.  *See, e.g., United States* v. *Kim*, 595 F.2d 755, 765 (D.C. Cir. 1979) (business records); *Murphy Auto Parts Co.* v. *Ball*, 249 F.2d 508, 510 (D.C. Cir. 1957) (excited utterances).  These narrow exceptions to the rule against hearsay have, over the decades, been

codified in the Federal Rules of Evidence, each pursuant to a well-recognized reason to expect the statement would have a circumstantial guarantee of trustworthiness.

By their terms, the Federal Rules of Evidence apply in habeas corpus proceedings "to the extent that matters of evidence are not provided for in the statutes which govern procedure therein or in other rules prescribed by the Supreme Court pursuant to statutory authority." Fed. R. Evid. 1101(e); *see Greiner* v. *Wells*, 417 F.3d 305, 325-26 (2d Cir. 2005) (excluding hearsay in a habeas case pursuant to Federal Rules of Evidence), *cert. denied.*, 546 U.S. 1184 (2006). Therefore, the hearsay rules and their exceptions apply in habeas corpus proceedings except as otherwise established by statute or by rule propounded in accordance with the Rules Enabling Act, 28 U.S.C. §§ 2072, *et seq.* The habeas statute permits admission of affidavits in habeas corpus cases, in the court's discretion, but such permission triggers the opposing party's "right to propound written interrogatories to affiants, or to file answering affidavits." 28 U.S.C. § 2246. Discretion to admit evidence by affidavit must be exercised with caution. *See Herrera* v.*Collins*, 506 U.S. 390, 417 (1993) ("affidavits are disfavored [in a habeas corpus action] because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations").

In acknowledging that hearsay "may" sometimes – in the specific context of a traditional battlefield detention – be accepted as "the most reliable available evidence," the *Hamdi* plurality did not express any intent to repeal the Federal Rules of Evidence as they are applied to habeas corpus proceedings. *See Hamdi* 542 U.S. at 533-34. Rather, the plurality's comment should be viewed merely as acknowledging that the district court has discretion to admit affidavits under 28 U.S.C. § 2246 or other hearsay under Rules 803 through 807 of the Federal Rules of Evidence, and that the reliability of such hearsay will frequently be the decisive factor as to

whether it should be admitted. *See also Al-Marri*, 2008 WL 2736787 *45 (Traxler, J., concurring) (hearsay is admissible only if government bears its burden to demonstrate that reliance on non-hearsay evidence would be "unduly burdensome"). The Rules of Evidence and applicable statutes remain in place after *Hamdi*, as they must under the Rules Enabling Act. Therefore, any hearsay not admissible under Rules 803-807 of the Federal Rules of Evidence should be under oath and subject to the statutory procedural requirements of 28 U.S.C. § 2246.

Significantly, Petitioner has been detained for almost six years thousands of miles from the site of his arrest.  He has had no prior meaningful access to witnesses.  He will face much greater evidence-gathering hardships than the government, which has resources and access to the evidence it has already collected.  Accordingly, affidavits may be admitted under 28 U.S.C. § 2246 based on Petitioner's showing that they are reliable and that they are necessary due to logistical barriers to his in obtaining other evidence.

In determining whether to allow admission of an affidavit or other hearsay in lieu of live testimony or a deposition, the Court's discretion should be guided by a number of considerations.

1. As with each of the procedural issues on which this Court has ordered briefing, the Court must consider the Petitioner's substantial liberty interests and the high risk of error. Petitioner is effectively on trial for his life. *See, e.g., Boumediene*, 128 S. Ct. at 2238 ("the consequence of error may be detention of persons for the duration of hostilities that may last a generation or more").  Under these circumstances, the risk of factual error is exceptionally high, since it is not anticipated that Petitioner's detention will be justified by the direct testimony or observations of U.S. military members. *Cf. Hamdi*, 542 U.S. at 512-13 (petitioner was captured with an assault rifle and was part of a "Taliban unit" in a "foreign combat zone" during active hostilities).

Although Petitioner's significant liberty interest may be balanced with national security considerations, those national security considerations have become weaker, and Petitioner's interest has become stronger, as the years of indefinite detention have dragged on. *See Rasul*, 542 U.S. at 488 (Kennedy, J., concurring) ("[A]s the period of detention stretches from months to years, the case for continued detention to meet military exigencies becomes weaker"). The government has had nearly six years to perfect its case. If the government cannot marshal reliable evidence in the substantial time it has been allowed, it is fair to infer that no reliable evidence exists to justify continued detention.

2. The Court should consider the availability of the declarant, and whether the hearsay affidavit is necessary and is the "most reliable available evidence," *Hamdi*, 542 U.S. at 533-34; *see also United States v. Dunford*, 148 F.3d 385, 392 (4th Cir. 1998) (the requirement of circumstantial guarantees of trustworthiness is the "most important element" for admissibility under the residual hearsay exception). Out-of-court statements should be viewed skeptically and can and should be excluded if they lack reliability. *See Parhat*, 2008 WL 2576777 (rejecting hearsay evidence that lacked indicia of reliability); *United States v. Fernandez*, 892 F.2d 976, 983 (11th Cir. 1989) (rejecting hearsay based on unreliability of declarant); *Jian An Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1998) (affirming exclusion of deposition testimony under Fed. R. Evid. 403, due to lack of reliability of source).

Therefore, before admitting hearsay evidence, the court must have adequate information to assess the reliability of the source and to determine that the information presented is credible. In *Parhat*, for example, the Court of Appeals addressed government intelligence reports containing assertions regarding a group's supposed connections with al Qaida and the Taliban. Similar reports can be found throughout the CSRT records for many Guantanamo detainees

alleged to have been associated with other groups believed to have connections with al Qaeda. In rejecting the intelligence reports as a basis for supporting the petitioner's classification as an "enemy combatant," the court noted that there was no information concerning the sources of the allegations allowing the court to assess their reliability. 2008 WL 2576777, at *13. As the Court of Appeals held, information concerning the reliability of the declarant is essential in evaluating the evidence. *See id.* This conclusion is in line with the spirit of the Federal Rules of Evidence, which liberally allow evidence attacking the credibility of a hearsay declarant, *see* Fed. R. Evid. 806, and require disclosure of the identity of the declarant of any hearsay admitted under the residual hearsay exception, *see* Fed. R. Evid. 807.

Although this Court may take into consideration the government's interest in protecting its sources and methods of intelligence gathering, *Boumediene*, 128 S. Ct. at 2276, such asserted interests cannot be an excuse for admitting hearsay without sufficient information to assess its reliability. *Parhat*, 2008 WL 2576777, at *13 ("[W]e do not suggest that hearsay evidence is never reliable -- only that it must be presented in a form, or with sufficient additional information, that permits the Tribunal and court to assess its reliability"). As the Court of Appeals suggested in *Parhat*, courts have the tools and experience necessary to protect national security interests without sacrificing reliable fact-finding, including, for example, providing information only to counsel with security clearances or by adapting procedures under the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III, § 4. *See Parhat*, 2008 WL 2576777, at *13.

The mere existence of supposedly corroborating evidence which itself lacks indicia of reliability must be considered insufficient to support the admission of hearsay. *See Parhat*, 2008 WL 2576777, at *13-14. For example, the D.C. Circuit did not find persuasive the government's

contention that its evidence in *Parhat* was more reliable simply because its assertions had appeared "in at least three different documents." *Id.* ("[T]he fact that the government has 'said it thrice' does not make an allegation true"). The trustworthiness of a statement cannot be analyzed "solely on the basis of the facts corroborating the authenticity of the statement." *United States* v. *Bailey*, 581 F.2d 341, 349 (3rd Cir. 1978) (analyzing admissibility of evidence under residual hearsay exception); *see also Huff* v. *White Motor Corp.*, 609 F.2d 286, 293 (7th Cir. 1979). Instead, each piece of hearsay must be analyzed according to its own circumstantial guarantees of trustworthiness. *See id.*

Among other circumstances that must be considered with regard to the credibility of the source is the manner by which any hearsay declaration was obtained. Among other things, the proponent of hearsay must be prepared to disclose to this Court and opposing counsel the interrogation techniques employed on its sources. It is well recognized that evidence obtained through torture or threats, for example, is too unreliable to be admitted into evidence. *See Stein v. New York*, 346 U.S. 156, 182 (1953) ("The tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to … treat[] any confession made concurrently with torture or threat of brutality as too untrustworthy to be received as evidence of guilt"); *see also Dickerson* v. *United States*, 530 U.S. 428, 432 (2000). Indeed, the judge in the military trial of Salim Hamdan, Navy Captain Keith Allred, recently excluded evidence obtained by the military from Mr. Hamdan in a series of interrogations at the Bagram Air Force Base and in Panshir, Afghanistan, because of the "highly coercive environments and conditions under which they were made." Mike Melia, *Detainee-trial judge bars coerced evidence*, Associated Press, July 22, 2008. In this habeas case, declarations procured by the government from other detainees

implicating Petitioner may well be a product of a similarly "highly coercive environment," and therefore should be inadmissible in a habeas proceeding.

3. Before considering an affidavit under 28 U.S.C. § 2246, the Court must consider the materiality of the evidence to be presented by affidavit, the reliability of the evidence, and whether it relates to a disputed factual issue in the case. Although a habeas petition may be decided on the basis of affidavits, contested facts may not be decided on affidavits alone unless there is other evidence in the record supporting them. *See Jordan* v. *Estelle*, 594 F. 2d 144, 146 (5th Cir. 1979). It is well-established that the affidavit procedure of 28 U.S.C. § 2246 cannot be used to resolve substantial disputed questions of material fact. *See supra* Section I(B) (requirement of evidentiary hearing to resolve disputed issue of material fact); *Jones* v. *Cunningham*, 313 F.2d 347, 353 n. 4 (4th Cir. 1963) ("[I]ssues of fact presented in habeas corpus proceedings may not be established by ex parte affidavits"); *Campbell* v. *Minnesota*, 487 F.2d 1, 4 n.3 (8th Cir. 1973) (affidavits under 28 U.S.C. § 2246 "cannot be used to resolve substantial disputed questions of fact"); *Owens* v. *Frank*, 394 F.3d 490, 498 (7th Cir. 2005) ("When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive").

4. Finally, even in cases where the Court may determine that national security and other considerations warrant the admission of a particular affidavit, there is no statutory or other authority that would permit the Court to admit the affidavit without allowing the opposing party the opportunity to propound written interrogatories or to obtain and present an answering affidavit. *See* 28 U.S.C. § 2246. Nor is there any authority for admission of hearsay not otherwise allowed by the Federal Rules of Evidence except by deposition or affidavit under 28 U.S.C. § 2246. *See* Fed. R. Evid. 1101(e) (Federal Rules of Evidence apply in habeas cases except as provided by statute or other rules).

Of course, the Court has discretion in appropriate cases to admit hearsay under the residual hearsay exception under Rule 807 of the Federal Rules of Evidence if such hearsay has "circumstantial guarantees of trustworthiness" equivalent to the recognized exceptions to the rule against hearsay. But even reliable hearsay under Rule 807 is admissible only if the Court makes the requisite findings that the statement is "offered as evidence of a material fact," that it is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," and that its admission would best serve "the general purposes of [the Federal Rules of Evidence] and the interests of justice." Fed. R. Evid. 807. Hearsay under the residual exception may not be introduced unless there is an opportunity to inquire into its reliability and unless the proponent of the evidence gives the opposing party sufficient notice to allow the opposing party the fair opportunity to meet it, "including the name and address of the declarant." *Id.* As the D.C. Circuit has held, the residual hearsay exception is "a narrow exception to the hearsay rule, applying only in exceptional cases." *United States* v. *Kim*, 595 F.2d at 765.

In summary, because of the unique concerns raised by hearsay evidence, the Court should address the admissibility of proffered hearsay after assessment of its reliability and fairness, and in light of the facts and circumstances of this case.

## VII. THE SCOPE OF DISCOVERY AND THE GOVERNMENT'S BURDEN TO PRODUCE EXCULPATORY EVIDENCE.

### A. Reasonable Discovery Is Permissible And Warranted.

The federal habeas statute expressly authorizes discovery in habeas proceedings. Section 2246 provides that, if a party introduces an affidavit, the opposing party "shall have the right to propound written interrogatories to the affiants." *See Harris* v. *Nelson*, 394 U.S. 286, 296 (1969) (noting that § 2246 provides for "interrogatories for the purpose of obtaining evidence from

affiants where affidavits were admitted into evidence"). Further, in *Harris* v. *Nelson*, the Supreme Court held that, pursuant to the All Writs Act, 28 U.S.C. § 1651, habeas courts are authorized to expand discovery beyond measures specified in § 2246, and declared that it is "the inescapable obligation of the courts" to grant leave for discovery in appropriate circumstances. 394 U.S. at 299. The *Harris* Court instructed district courts to "fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage," to permit a petitioner to "secur[e] facts where necessary to accomplish the objective of the proceedings." *Id.* The Court in *Harris* did *not* conclude that "Federal Rules of Civil Procedure on discovery do not apply to habeas proceedings." *Gov't Br. at 23* (emphasis deleted). To the contrary, *Harris* provides for discovery mechanisms "in which a district court may, in an appropriate case, arrange for procedures which will allow development, for purposes of the hearing, of the facts relevant to disposition of a habeas petition." 394 U.S. at 298. Thus, while the liberal discovery process under the Rules of Civil Procedure may not be generally applicable in the habeas context, discovery is by no means prohibited. *Harris* recognizes that the Court may use the Rules of Civil Procedure "by analogy to existing rules or otherwise in conformity with judicial usage" to "fashion appropriate modes of procedure." *Id.* at 299. In fact, "[w]here their duties require it, this is the inescapable obligation of the courts." *Id.*

A petitioner is thus entitled to "the taking of evidence in habeas proceedings by deposition, affidavit or interrogatories." *Hamdi*, 542 U.S. at 525 (citing § 2246). *See also Al-Marri*, 2008 WL 2736787, at *49 n. 16 (Traxler, J., concurring) (citing "discovery" as part of the "process normally available [to persons] who challenge their executive detention"); *El-Banna v. Bush*, No. 04-CV-1144, 2005 WL 1903561 (D.D.C. 2005) (Roberts, J.) (ordering the government to preserve evidence regarding petitioners' detention at Guantanamo, in view of the habeas

court's plenary power of inquiry, and petitioners' right to discovery); Rule 6 of the Rules Governing Section 2254 Cases (authorizing discovery in § 2254 cases; applicable to other types of habeas cases through Rule 1(b)).

Boumediene specifically noted that the availability of discovery to a habeas petitioner counted among the procedural rights that, historically, "preserved the writ and its function." 128 S. Ct. at 2263 (citing Harris, 394 U.S. at 299-300). Indeed, the notable absence of discovery in DTA review contributed to the Supreme Court's conclusion that a DTA proceeding "falls short of being a constitutionally adequate substitute." 128 S. Ct. at 2272 (noting, under DTA review, the detainee's lack of opportunity "to present evidence discovered after the CSRT proceeding concluded").[10]

Discovery in habeas cases generally requires leave of court and should be allowed if the request is based on "specific allegations" by the petitioner. See Harris, 394 U.S. at 300 (where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry"). The availability of discovery in habeas litigation therefore depends on "the facts of [a] particular case." Compare Bracy v. Gramley, 520 U.S. 899, 909 (1997) (Rehnquist, C.J.) (9-0) (holding that "given the facts of this particular case," the habeas court abused its discretion when it denied discovery to the petitioner) with Murphy v. Johnson, 205 F.3d 809, 814 (5th Cir. 2000) (affirming denial of habeas discovery where discovery request was "based purely

---

[10] Boumediene further noted the habeas court's discretion to "accommodate" the government's interest in protecting sources and methods of intelligence gathering. 128 S. Ct. at 2276. By instructing habeas courts to "accommodate" the government's interests in secrecy in certain information, the Supreme Court implied that, in the first instance, habeas petitioners would be able to make requests for disclosure of information. Of course, nothing in the Court's opinion should be read to foreclose discovery of alleged "sources and methods" where such information is material and exculpatory.

on speculation"). But this Court should be more permissive in considering discovery requests than even the *Harris* court, which considered a collateral attack on a prior state court judgment. In such a typical habeas proceeding, a petitioner would have already had (in the earlier proceeding) a full opportunity for discovery pursuant to state or federal rules of criminal procedure, would have been provided full access to exculpatory material pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), and would have had the full opportunity to confront and cross-examine all the evidence ultimately supporting a judgment in his case. A regime of limited discovery thus makes sense in a post-conviction context, where the full apparatus of criminal procedure and constitutional law presumptively affords the habeas petitioner all the discoverable information he would need. By contrast, in this challenge to executive detention, where Petitioner has not had a prior adjudication consistent with due process, ordinary post-conviction presumptions do not apply. *Boumediene*, 128 S. Ct. at 2267 ("[T]he common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention"); *St. Cyr*, 533 U.S. at 301 (protections of habeas corpus "have been strongest" in the context of executive detention). Accordingly, the need for discovery in this case will be much greater.

Contrary to the government's assertion, habeas review is far more than a mere check for legal sufficiency in a proceeding where the petitioner cannot controvert the government's facts (*Gov't Br. at 22-23*). Habeas is, and always has been, a searching fact-finding endeavor.[11]

---

[11] Historically, the Judiciary Act of 1789 gave courts authority "to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment." 1 Stat. 73, 82. To accomplish this task, the courts have a "duty ... to cause the facts on which they found their sentence or decree, fully to appear upon the record." 1 Stat. at 83. The Judiciary Act of 1789 further provided, "That the mode of proof by oral testimony and examination of witnesses in open court shall be the same in all the courts of the United States, as well in the trial of causes in equity and of admiralty and maritime jurisdiction, as of actions at common law." 1 Stat. at 88. *See also* Act of Aug. 29, 1842, ch. 257, 5 Stat. 539, 539 (judges "shall proceed to hear the said cause" to determine if it were "duly proved"); Act of Feb. 5, 1867, ch. 28, 14 Stat. 385, 386 (judges "shall proceed in a summary way to determine the facts of the case, by hearing testimony and the arguments of the parties interested").

Accordingly, factual development, including discovery and the duty to disclose exculpatory evidence, is required. *Boumediene* reaffirmed the role of discovery as necessary to "preserve the writ and its function." 128 S. Ct. at 2263. And, as set forth above, the fact that particular modes of discovery were not known in 1789 is irrelevant, *even if* the habeas remedy applicable in this case is frozen as of that date. Discovery is a procedural invention aimed at improving the search for truth under the substantive law. Courts are certainly entitled to utilize advances in procedure applicable in a modern world, even if the fruits of that procedure are applied to a 1789 substantive standard.

This case presents a number of unique challenges to Petitioner's ability to gather evidence that warrant reasonable discovery. Significantly, Petitioner had no prior discovery through a criminal proceeding leading to a conviction. Moreover, the relevant events occurred six years ago. Those events occurred in and involve distant countries. English is not the native language of many relevant witnesses. Petitioner has had no access to an attorney and his ability to now communicate with his attorneys is severely limited. Habeas law has long recognized that "[t]he very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris*, 394 U.S. at 291.

This case requires particular "initiative and flexibility" in the administration of discovery if the court is to remain faithful to the spirit of habeas corpus. Petitioner has presumably given scores if not hundreds of interviews to the government over the years. His mental health is unknown. It is anticipated the government will rely on summaries of a very limited set of Petitioner's interrogations, combined with summaries of other witness or intelligence information. At minimum, Petitioner should be permitted to serve document requests on the

government to discover evidence relevant to the government's case, including all Petitioner's statements, statements of other witnesses about Petitioner, Petitioner's health records, and exculpatory and impeachment evidence in all its forms.  If other forms of discovery are needed after those documents have been produced, the parties can make appropriate motions with the Court.

**B.  The Government Must Produce All Exculpatory And Impeaching Evidence In Its Possession.**

The government has "offered" to produce exculpatory evidence, but its offer is carefully worded and has many limitations: "The Government will provide any evidence that tends materially to undermine information presented in the return to supports a petitioner's classification as an enemy combatant, which the attorneys preparing the factual return encounter in developing the return."  This offer does not insure that Petitioner will    receive    exculpatory evidence in the possession of the Government.

The government has a duty and ongoing obligation to disclose to Petitioner evidence in its possession that falls within the definition of "exculpatory" and "impeaching" material, concepts well known and understood by the government.  *See Brady* v. *Maryland*, 373 U.S. 83, 87 (1963); *see also United States v. Agurs*, 427 U.S. 97 (1976); *United States* v. *Bagley*, 473 U.S. 667 (1985).  The government "has a duty to learn of any favorable evidence known to the others acting on the government's behalf," *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995), and must disclose exculpatory and impeaching evidence that is "material," *Bagley*, 473 U.S. at 668.

Failure to disclose exculpatory information "undermines confidence in the outcome." *Bagley*, 473 U.S. at 668.  Thus, this obligation not only guarantees fair treatment for detainees subject to a substantial liberty deprivation, *Brady*, 373 U.S. at 87, but it is also necessary to preserve the fundamental truth-seeking function of a serious, adjudicatory proceeding.  *Monroe*

v. *Blackburn*, 476 U.S. 1145, 1148 (1986); *Freeport-McMoRan Oil & Gas Co.* v. *F.E.R.C.*, 962 F.2d 45, 47 (D.C. Cir. 1992) (Mikva, C.J.) (reiterating Supreme Court's admonition in *Berger* v. *United States*, 295 U.S. 78, 88 (1935), now chiseled on the walls of the Justice Department, that a government lawyer "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation . . . is not that it shall win a case, but that justice shall be done").

Indeed, in light of the "considerable risk of error" inherent in the CSRT determinations, *Boumediene*, 128 S. Ct. 2270, and the widely-disclosed reports of large numbers of innocent men detained at Guantanamo, an order regarding exculpatory evidence is not mere housekeeping, proposed to serve a routine administrative obligation. Rather, it is necessary to fulfill this Court's role in assessing "the sufficiency of the Government's evidence against a detainee," *id.* – evidence which may well exist outside the CSRT records which comprise the current factual returns. *See id.* (noting the habeas court's "authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding").

In the criminal context, it is settled that the government has a duty to disclose exculpatory material in the possession of the prosecution regardless whether the defendant requests such material. *Agurs*, 427 U.S. at 112-13. Similarly, the government's duty to disclose here should be independent of a request from Petitioner, or even an order from a court, and it should continue during the pendency of habeas proceedings. *See Steidl* v. *Fermon*, 494 F.3d 623, 469 (7th Cir. 2007) (state's "ongoing duty to disclose exculpatory information . . . extends throughout the legal proceedings that may affect guilt or punishment, including post-conviction proceedings"). Petitioner submits that it would be appropriate for the court to put the government on notice, well in advance, that *sua sponte* disclosure of these materials is an essential element of its production obligations.

The government's duty to locate and to disclose exculpatory evidence is grounded in due process. The constitutional imperative for this Court to take exculpatory evidence into account cannot be limited only to exculpatory evidence independently obtained and introduced by the Petitioner, but must include evidence in the government's possession. In the context of habeas corpus litigation involving a state conviction, the Supreme Court rejected the proposition that "the prosecution can lie and conceal and the prisoner still has the burden to ... discover the evidence," in "a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (citing *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (quoting *United States* v. *Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926) (internal quotation marks omitted))). Concealing exculpatory evidence undermines the government's role as a seeker of truth. *Banks*, 540 U.S. at 696 (citing *Strickler* v. *Greene*, 527 U.S. 263, 281 (1999)). The government should not be rewarded for unwarranted concealment. *Banks,* 540 U.S. at 696 (citing *Kyles* v. *Whitley,* 514 U.S. 419, 440 (1995) ("The prudence of the careful prosecutor should not . . . be discouraged")).

The government's proposal to provide only that exculpatory evidence its attorneys happen to see is fundamentally inconsistent with the government's responsibilities in an adversary proceeding in which such a serious liberty deprivation is at stake. *See, e.g., Demjanjuk* v. *Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993) (applying *Brady* to civil immigration cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party proceeded against). The Supreme Court has made clear that willful blindness is not sufficient: "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. "Because the prosecution is in a unique position to obtain information known to other agents of the

41

government, it may not be excused from disclosing what it does not know but could have learned." *Carriger* v. *Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (*en banc*); *see also United States* v. *Chapman*, __ F.3d __, 2008 WL 1946744, at *10 (9th Cir. May 6, 2008) (holding that reckless failure to disclose exculpatory information as required by the Constitution may constitute flagrant misconduct in violation of due process).

Thus, Petitioner proposes that this Court order as follows:

> The government shall disclose to Petitioner's counsel all exculpatory evidence, including impeaching evidence, in its possession relating to Petitioner. Disclosure by the government should occur as soon as it discovers this evidence, and shall in no event occur later than thirty (30) days prior to the scheduled date of the evidentiary hearing in his case. The term "exculpatory material," including impeaching evidence, refers to evidence that falls within the definition of this term in ordinary criminal proceedings in the United States. *See Kyles v. Whitley*, 514 U.S. 419 (1995).

## VIII. THE APPLICATION OF THE RIGHT TO CONFRONTATION AND COMPULSION.

### A. Petitioner Has Rights Of Confrontation and Compulsory Process.

The habeas statutes and the Federal Rules of Evidence plainly anticipate that Petitioner, through his counsel, will have the right to cross-examine available witnesses, either in court or by deposition, and to object to inadmissible hearsay. *See* Fed. R. Evid. 1101(e); 28 U.S.C. § 2246. Moreover, the Court plainly has the power to compel the attendance of witnesses within its jurisdiction and to authorize the taking of depositions outside of its jurisdiction. *See* Fed. R. Civ. P. 45.

There is no doubt that the opportunity to confront a witness is a central and crucial feature of the common law adversarial system. *Pointer v. Texas*, 380 U.S. 400, 408 (1965) (Harlan., J., concurring) (the "right of confrontation is "implicit in the concept of ordered liberty") (quoting *Palko* v. *Connecticut*, 302 U.S. 319, 325 (1937)). As Justice Scalia explained,

"[i]t is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine." *Crawford* v. *Washington*, 541 U.S. 36, 49 (2004) (citation omitted). This feature is not limited to the criminal context:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so he has an opportunity to show that it is untrue. . . . [This principle] is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. . . . This Court has been zealous to protect these rights from erosion . . . . [including] in all types of cases where administrative and regulatory actions were under scrutiny.

*Greene* v. *McElroy*, 360 U.S. 474, 496-97 (1959); *see also In re Oliver*, 333 U.S. 257, 273 (1948) (the right to the opportunity to be heard in one's defense includes one's "right to examine the witnesses against him").

Indeed, in upholding the legality of other administrative detention schemes, the Supreme Court has insisted on the preservation of this principle. *See, e.g. Hendricks*, 521 U.S. at 353 (civil commitment of violent sexual offenders). It is a necessary requirement in a deportation proceeding, *see, e.g. Kwong Hai Chew* v. *Colding*, 344 U.S. 590, 596 (1953), for a hearing involving the termination of government benefits, *see Goldberg* v. *Kelly*, 397 U.S. 254, 270 (1970), and as a part of trials conducted under the Uniform Code of Military Justice, *see, e.g.*, *United States* v. *Anderson*, 51 M.J. 145, 149 (C.A.A.F. 1999) ("There are few subjects perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement").

The most effective method of testing the reliability of evidence is cross-examination. Petitioner acknowledges that hearsay may be admissible in certain contexts if sufficient circumstantial guarantees of trustworthiness are shown to exist. *See infra.*. But the baseline assumption, applying a prudent and incremental approach, should be that evidence will be presented by witnesses subject to cross-examination. *See Al-Marri*, 2008 WL 2736787 at *49 (Traxler, J., concurring). A party seeking to admit hearsay should face a heavy burden to show that it is both necessary and reliable. Rulings on specific offers of evidence items should be determined on the merits in a manner that allows the parties time to incorporate the decision into the presentation of their case.

## IX. THE ROLE OF THE COMBATANT STATUS REVIEW TRIBUNAL IN THE HABEAS PROCEEDINGS.

**A.** The CSRT Proceedings Have No Relevance In This Matter.

The government contends that the CSRT will "provide important information" for the factual return and the "Tribunal decision itself will also constitute evidence that a petitioner is an enemy combatant." *Id.* at 21-22.

Petitioner contends that the Tribunal decision has no value in this Court. Tribunals were hopelessly compromised by command influence, by the absence of counsel for detainees, by rules that prevented detainees from garnering any meaningful evidence, and by many other flaws outlined by the Supreme Court and others.

> Petitioners identify what they see as myriad deficiencies in the CSRTs. The most relevant for our purposes are the constraints upon the detainee's ability to rebut the factual basis for the Government's assertion that he is an enemy combatant. As already noted, see Part IV-C, *supra*, at the CSRT stage the detainee has limited means to find or present evidence to challenge the Government's case against him. He does not have the assistance of counsel and may not be aware of the most critical allegations that the Government relied upon to order his detention.

***********

Although we make no judgment as to whether the CSRTs, as currently constituted, satisfy due process standards, we agree with petitioners that, even when all the parties involved in this process act with diligence and in good faith, there is considerable risk of error in the tribunal's findings of fact. This is a risk inherent in any process that, in the words of the former Chief Judge of the Court of Appeals, is "closed and accusatorial." See *Bismullah III, 514 F.3d at 1296* (Ginsburg, C. J., concurring in denial of rehearing en banc). And given that the consequence of error may be detention of persons for the duration of hostilities that may last a generation or more, this is a risk too significant to ignore.

*Boumediene*, 128 S. Ct. at 2269-70. Moreover, one Tribunal member has testified that evidence provided to the CSRT panel on which he served "lacked even the most fundamental earmarks of objectively credible evidence." *See* Abraham Declaration, discussed *supra*.

Thus, Tribunal decisions in general are not trustworthy and should not be admitted into evidence in this matter in any form.

## X. CONCLUSION

For the reasons stated herein, petitioner Sharifullah respectfully requests that the Court enter an order in accordance with the foregoing arguments.

Respectfully submitted, August 22, 2008.

/S/ J. Griffin Morgan
J. Griffin Morgan (D.C. Cir. Bar No. 51744)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Tel: (336) 724-2828
Fax: (336) 714-4498

Robert M. Elliot (D.C. Cir. Bar No. 51320)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Tel: (336) 724-2828
Fax: (336) 714-4499

C. Frank Goldsmith, Jr.(D.C. Cir. Bar No. 51666)
Goldsmith Goldsmith & Dews, P.A.
P. O. Box 1107
Marion, NC 28752-1107
Tel:  (828) 652-3000
Fax:  (828) 652-9196

Attorneys for Petitioner

Shayana D. Kadidal
J. Wells Dixon
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway 7th Floor
New York NY  10012
 Tel: (212) 614-6438